*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* ESTATE OF FRANKFORD.

---

MICHAEL FRANKFORD, Personal Representative
of the ESTATE OF DAVID WARREN
FRANKFORD,

      Appellant,

v

COURTNIE FULTZ,

      Appellee.

UNPUBLISHED
February 18, 2025
12:03 PM

No. 367800
Oakland County Probate Court
LC No. 2022-410204-DE

---

Before: YOUNG, P.J., and GARRETT and WALLACE, JJ.

PER CURIAM.

Appellant, Michael Frankford ("Michael"), appeals as of right the trial court's order admitting two handwritten, unsigned documents as David Warren Frankford's ("decedent") will for probate under MCL 700.2503 (documents intended as wills). We affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Decedent was married to Debora Frankford ("Debora") for 33 years until she passed away in March 2015. At the time of their marriage, Debora had two young children: eight-year-old April Gaines ("April") and Chad Wayne, now deceased. April now has five children: appellee, Courtnie Fultz ("Courtnie"), Christine Gignac ("Chrissy"), Candice Motley,[1] Alyssa Gaines, and Autumn Gaines. Chad had two children: Destiney Bailey and Amanda Wayne. In addition to their seven total children, April and Chad have nine total grandchildren.

---

[1] Candice's last name was previously Bauknecht, but changed upon her marriage in April 2023.

## A. DECEDENT'S ESTATE PLANNING DOCUMENTS

Shortly after his wife's death, decedent met with an attorney, Kathryn Caruso ("Caruso"), to prepare a will and finalize his estate. Decedent took dated and handwritten notes either during or after the meeting. On May 12, 2015, decedent received drafts from Caruso of his Last Will and Testament (the unsigned will), his Revocable Living Trust (the trust), Durable Power of Attorney, Medical Power of Attorney, and HIPAA Authorization. The documents also contained an enhanced life estate deed, referred to as a ladybird deed, to decedent's house in Holly, Michigan. The deed granted the house to April. The unsigned will nominated Courtnie to act as decedent's personal representative and, in the event that she was unavailable, nominated April. The unsigned will left all decedent's tangible personal property to the trust. The trust nominated Courtnie as trustee after decedent's death and April as successor trustee if Courtnie was "unwilling or unable to act." The trust stated, in pertinent part:

> 5.1   DESIGNATED PRIMARY BENEFICIARY:
>
> [Decedent's] designated Primary Beneficiaries are his step-grandchildren, namely, COURTNEY PLUMMER, CHRISSY GIGNEC, CANDACE BAUCHENECT, ALYSSA GAINES, AUTUMN GAINES, DESTINY BAILEY AND AMANDA WAYNE; and a class of step-great-grandchildren, namely, MILEY PLUMMER, THOMAS GIGNEC, DAKOTA GIGNEC, AURORA GIGNEC, ELLIOT BAUCHENECT, and ROWAN BAILEY.

Caruso asked decedent to review the documents and contact her to arrange formal execution. For unknown reasons, decedent never followed up with Caruso and never formally executed any of the documents. Decedent passed away over seven years later on October 28, 2022. Michael applied as the brother of decedent and only heir, asserted decedent died intestate and requested informal appointment as personal representative.

At some point after decedent's passing, Courtnie found a packet of handwritten documents inside a box in Debora's "computer room." Underneath the handwritten documents were the estate planning documents decedent previously received from Caruso. Courtnie later testified the box was "where [decedent] had told [her] it was." The first two pages were a list of guns decedent owned. The third page was a note about a PNC Bank beneficiary form along with an account number marked "this is for grandkids college." Page four was a list of decedent's step-family. Pages five and six were a numbered list titled "how to set up will or trust," beginning with "property deeds" before matching "house-April" with "ladybird" and "cabin-kids" with "trust." Pages seven and eight consisted of a list numbered 1 to 15 (the unsigned will), and stated, in relevant part:

> (1) Courtnie's name correct spelling (last name)[2]
>
> (2) Deed ID. # for McKinley (to grandkids)

---

[2] Courtnie is mistakenly referred to as "Courtney Plummer" in the estate planning documents.

(3) Bank Acc # I need to put Courtnie's name on

(4) PNC Bank Acc. # for school trust. Use by 21 or divide between grandkids when Autumn turns 25

\* \* \*

(9) I need to sell Lakewood Shores property

(10) My IRA divide between grandkids[.]  Need benf. form for Courtnie[.]  70% to grandkids + 30% to great grandkids[.]  Must be 25 yrs old to get money.

\* \* \*

(13) I am to be cremated, half of my ashes on top of Deb + half dump in the river[.] Next float trip down the river, take $2,000.00 from savings acc to pay for (up north party) and the luncheon at my memorial service.

(14) I will set up with Dryer Funeral Home a prepaid cremation, NO viewing[.] Have a memorial service within [one] month and a luncheon for my family + friends, you can have a memorial service + luncheon at the house if you want to, put up a good spread of food + booze, keep at least $500 for up north service[.] When you throw ashes in river have a party.  I am not religious so do not have a preacher, kids can say something like they did at gram['s] funeral.

(15) April to get the house, split up contest [sic].  Among kids except for personal thing [sic].  Like furniture to designated people[.]  I will make a list.

Pages 9 through 12 were the May 2015 notes decedent wrote during or after his meeting with Caruso.

Courtnie filed a competing petition for probate and sought appointment as personal representative.  Courtnie attached the unsigned will to the petition and requested it be admitted to probate as decedent's will.  Michael objected, arguing seven years had passed and decedent never executed the proffered documents nor did he ever contact Caruso about executing them.  Michael asserted the relationship between decedent and his step-family had soured in the years since Debora's death, exacerbated by decedent's new girlfriend, Michele Wharton ("Michele"). Decedent "made it known" if Michele continued to be excluded, decedent no longer wished to associate with his step-family.

## B.  BENCH TRIAL

Michael and Courtnie filed trial briefs.  Michael argued the unsigned estate planning documents, including the unsigned will in list-form, were "mere drafts" that decedent did not intend to become his will, and the only people able to testify decedent ever mentioned having a will were members of his step-family who stood to inherit if the documents were probated as decedent's will.  Michael argued the notes were unreliable because they were not dated or signed, and the handwriting was not verified by an expert as belonging to decedent.  Courtnie argued

-3-

testimony would prove decedent "believed his estate plan was secure, and that he was leaving his property to [his step-family]." Courtnie argued "the face of the documents and supporting evidence demonstrate clear and convincing evidence that the documents reflect [decedent]'s wishes and should be considered his will pursuant to MCL 700.2503."

At trial, Caruso testified her notes reflected decedent "knew he had a brother and was opting to exclude him." Linda Turman ("Linda"), also testified she was great friends with decedent for over 45 years, and decedent considered his step-family to be his family. In contrast, Linda believed there was conflict between decedent and Michael. Linda testified decedent never wanted to discuss Michael, and became tense at the mention of him. Decedent told Linda he was worried his step-family would not "take" him dating Michele very well because it was soon after Debora passed. Decedent told Linda he visited an attorney and his estate was "all in order and it was just going to April and the kids."

Greg McKenzie ("Greg") testified he and decedent were best friends for 20 years, describing decedent's relationship with his step-family as "excellent" and decedent was always talking about all the activities and holidays they spent together. Greg discussed with decedent if he planned on leaving anything to Michael when he passed. Decedent said no, but clarified he "might leave [Michael] an old rifle that [their] dad gave [decedent] that [Michael] wanted." Greg estimated that in 2019, decedent asked Greg if he had his estate in order, telling Greg he "went to a lawyer, woman lawyer in town and got a will made." Decedent told Greg he was leaving the house to April and "everything" to his "grandchildren and his daughter." Greg believed Courtnie was to be in charge of the estate.

Courtnie testified that after Debora passed, decedent had a conversation with Courtnie, Chrissy, Candice, and Destiney regarding his estate plan. Decedent stated the money in his bank account was for all of the grandchildren for their education. Decedent told Courtnie she needed to prepare to be in charge of these things. April would get the house, but not any money because decedent was splitting his money 70% to the step-grandchildren and 30% for the step-great-grandchildren. Decedent warned them to behave on the "up north property," (the property) because he was leaving it to them. Courtnie never saw decedent's will, but decedent showed her where it was located in a manila folder in a box in Debora's "computer room."

Decedent was diagnosed with cancer at some point after 2019. At that time, decedent told Courtnie he wanted a living room chair to go to Michele on his passing. Courtnie joked: "[Y]ou better have a will." Decedent responded: "[Y]ou know, I do, and you know where it is[.]" Courtnie recalled her last conversation with decedent regarding his estate plan was about July 2022. Courtnie wanted a toilet installed in the property and decedent said she would be able to do so with the money she received on his passing.

Courtnie asserted she and her family had a "great relationship" with decedent and Courtnie "never used the word 'step grandpa' ever in [her] life." The entire family got together at least once a month to celebrate a family member's birthday and they celebrated every holiday together at April's house. Decedent picked Courtnie's daughter up at least once a week for ice cream from 2015, until his passing. Courtnie reiterated she was close with decedent her entire life and there "was never an issue between my grandpa and us, ever."

Destiney testified decedent took on a "very much male figure" role in her life after her father passed away, and he was "very involved" in her life and the lives of her children. After Debora passed, decedent told Destiney he was meeting with a lawyer "to get everything in order because he didn't want [them] to have to go through what he was going through with [Debora's estate]." Destiney testified she had multiple conversations with decedent over the years and decedent was consistent in stating the house was going to April and his money would be divided between the step-grandchildren and step-great-grandchildren. Decedent told Destiney his estate documents were located in Debora's "computer room." Decedent stated his will was "finalized[.]" A receipt was located after decedent's passing with the documents showing decedent paid for his will to be finalized. Destiney opined there might be a signed copy of the will in decedent's locked gun closet because it was unlike decedent to pay to execute a will and fail to do so. Decedent was "very thorough" and Destiney believed decedent thought his will "was in order and settled[.]"

April testified decedent always introduced her as his daughter and treated her as such. The relationship between April and decedent did not change after Debora's passing. Decedent "was there for every event, every birthday, every holiday. He was involved in all of our lives." In February 2016, decedent told April he wanted the house to go to her on his passing and the property to go to his step-grandchildren. April acknowledged decedent never specifically told her he had a will, but told April on multiple occasions his estate plans were "taken care of" and "[e]verything was handled with the funeral home." Courtnie contacted the funeral home upon decedent's passing and delivered his eulogy.

Chrissy and Candice testified their relationship with decedent did not change after Debora's passing and they remained close with him until his death. Candice explained her son had cancer in the past year and was receiving treatment at the same time as decedent. Decedent texted or called Candice almost every day to check in on her son's treatment and let her know decedent loved them. Amanda testified decedent was a "father figure" for her because of her own father's passing. Amanda and decedent met for lunch at the same restaurant on a monthly basis. Courtnie, Destiney, April, Chrissy, and Candice all presented photographs to the trial court of themselves and their children with decedent and Michele throughout the years after Debora passed.

Michele lived with decedent for the last two years of his life. Michele characterized her relationship with decedent's step-family as "[mostly] good" but stated April would not speak to her. Michele acknowledged she stated in her affidavit: "The complete lack of communication between April and I created considerable tension between [decedent] and April and their own relationship, which continued to deteriorate over time." Michele did not attend holidays with decedent at April's house because she was not invited. Michele attended holiday gatherings with decedent's other family, including Michael, and explained decedent would spend "an hour or two" at April's house before meeting Michele.

Michele characterized decedent's relationship with Michael as "good." Decedent told Michele he had met with a lawyer in 2015, and "put Courtnie on his checking account and [Courtnie] on the safety [sic] deposit box." Michele asserted about three weeks before decedent passed, he "just looked at [her] and said I did not finish my will." Michele contacted Courtnie, but not Michael, the day of decedent's passing. Michele did not know why she did not contact Michael.

Michael testified he and decedent were "very close." Michael asserted he visited decedent "[p]robably once a week" and "talked to him once a week" on the phone.

After listening to two full days of testimony from decedent's family members, the trial court found "by clear and convincing evidence, [the list[3] is] in fact a writing reference[d] in [MCL 700.2503], a writing that [decedent] intended to be his [will]." The trial court explained in making the decision, it went "back and forth." The trial court reiterated that several witnesses testified that decedent told them many times over the years that April was getting the house, Courtnie was going to be in charge of the estate, and the step-grandchildren were getting the property, among other things. The trial court "found their testimony very credible[,]" and noted the testimony, the handwritten notes, and the estate planning documents were "all consistent." The trial court acknowledged the list did not "get rid of everything" but found when decedent told Michele his will was not finished, he was referring to the fact the list did not dispose of all his personal property. The trial court held the list was "clearly all one document, clearly intended to be read after [decedent] died." The trial court entered an order admitting the list for probate as decedent's will under MCL 700.2503. This appeal followed.

## II. THE TRIAL COURT DID NOT ERR IN CONCLUDING THERE WAS CLEAR AND CONVINCING EVIDENCE THAT DECEDENT INTENDED THE LIST TO CONSTITUTE HIS WILL

Michael contends on appeal that Courtnie did not prove by clear and convincing evidence that decedent intended the unsigned list to constitute his will and the trial court erred in admitting the list to probate. We disagree.

## A. STANDARDS OF REVIEW

Appeals from a probate court decision are reviewed on the record, not de novo. *In re Temple Marital Trust*, 278 Mich App 122, 128; 748 NW2d 265 (2008). The standard of review of findings of fact made by a probate court sitting without a jury is whether those findings are clearly erroneous. *In re Bennett Estate*, 255 Mich App 545, 549; 662 NW2d 772 (2003). A finding is clearly erroneous when "a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *Id*. The reviewing court will defer to the probate court on matters of credibility, and will give broad deference to findings of fact made by the probate court because of the probate court's unique vantage point regarding witnesses, their testimony, and other influencing factors not readily ascertainable to the reviewing court. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989); MCR 2.613(C).

"This Court reviews de novo the proper interpretation of statutes. . . ." *In re Reisman Estate*, 266 Mich App 522, 526; 702 NW2d 658 (2005). Likewise, we review de novo the language

---

[3] Referring to the unsigned will—the handwritten document containing a list of 15 items on pages 7 and 8 of the unsigned estate planning documents that Courtnie submitted to probate court as decedent's will.

used in wills and the probate court's construction of a will. *Id.*; *In re Raymond Estate*, 483 Mich 48, 53; 764 NW2d 1 (2009).

## B. ANALYSIS

This is a contested will case wherein "the proponent of a will bears the burden of establishing prima facie proof of due execution." *In re Estate of Horton*, 325 Mich App 325, 330; 925 NW2d 207 (2018) (quotation marks omitted); see also MCL 700.3407(1)(b). It is undisputed the list is not a formal will under MCL 700.2502 because it was not executed.[4] However, MCL 700.2503 states:

> Although a document or writing added upon a document was not executed in compliance with section 2502, the document or writing is treated as if it had been executed in compliance with that section if the proponent of the document or writing establishes by clear and convincing evidence that the decedent intended the document or writing to constitute . . . [t]he decedent's will. [MCL 700.2503(a).]

"Under MCL 700.2503, any document or writing can constitute a valid will provided that the proponent of the document or writing establishes by clear and convincing evidence that the decedent intended the document or writing to constitute the decedent's will." *In re Estate of Horton*, 325 Mich App at 332 (quotation marks omitted); MCL 700.3407(1)(b). In other words, the document or writing must "evince testamentary intent, meaning that it must operate to transfer property only upon and by reason of the death of the maker[.]" *Id.* (quotation marks and citation omitted). "Moreover, the document must be final in nature; that is, [m]ere drafts or a mere unexecuted intention to leave by will is of no effect." *Id.* (quotation marks and citation omitted).

Evidence is clear and convincing when:

> it produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the fact-finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. Evidence may be

---

[4] According to MCL 700.2502(1), for a will to be valid, it must be:

(a) In writing.

(b) Signed by the testator or in the testator's name by some other individual in the testator's conscious presence and by the testator's direction.

(c) Signed by at least 2 individuals, each of whom signed within a reasonable time after he or she witnessed either the signing of the will as described in subdivision (b) or the testator's acknowledgment of that signature or acknowledgment of the will. [MCL 700.2502(1) (footnotes omitted).]

uncontroverted, and yet not be clear and convincing. Conversely, evidence may be clear and convincing despite the fact that it has been contradicted. [*In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995) (quotation marks and citation omitted).]

Michael argues the trial court erred in concluding Courtnie presented clear and convincing evidence that decedent intended the list to constitute his will because it is a "mere draft" of a to-do list and not a final testamentary document. Michael asserts decedent did not intend the list to be his will because the list is unsigned, undated, untitled, does not dispose of all of decedent's assets, and does not nominate a personal representative. Michael further argues the testimony at trial did not amount to clear and convincing evidence that decedent intended the list to constitute his will because it indicated no one besides Courtnie specifically heard decedent say he had a will.

In this case, the list divided up decedent's bank accounts and disposed of the house, the property, and various items of personal property. Decedent gave explicit instructions for his cremation, funeral, spreading of his ashes, and celebration of life. Decedent explained he would prepay for his cremation and identified from which bank account to remove the funds. Decedent specifically documented how he wanted his remains handled and property divided posthumously. It is a reasonable inference that decedent wrote the list in contemplation of his death and intended the items in the list to govern after his passing. See *In re Estate of Horton*, 325 Mich App at 334 ("Ultimately, in deciding whether a person intends a document to constitute a will, the question is whether the person intended the document to govern the posthumous distribution of his or her property.").

The statutory provisions in the Estates and Protected Individuals Code ("EPIC"), MCL 700.1101 *et seq.*, "must be liberally construed and applied to promote its underlying purposes and policies . . . including to discover and make effective a decedent's intent in distribution of the decedent's property[.]" *In re Estate of Horton*, 325 Mich App at 330 (quotation marks omitted); see also MCL 700.1201(b). "In considering the decedent's intent, 'EPIC permits the admission of extrinsic evidence in order to determine whether the decedent intended a document to constitute his or her will.' " *In re Estate of Horton*, 325 Mich App at 332; *In re Attia Estate*, 317 Mich App 705, 709; 895 NW2d 564 (2016); see also MCL 700.2502(3). Here, the trial court considered the testimony of numerous witnesses along with the unsigned estate planning documents. Decedent's friends and step-family members testified decedent repeatedly told them that he had met with a lawyer and his affairs were in order. Testimony was consistent that decedent intended for the house to go to April, Courtnie to be in charge of distribution, and the property and money to be split among the step-grandchildren and step-great-grandchildren. While Courtnie was the only one with whom decedent specifically used the word "will," he also physically showed her where it was located in a box in Debora's "computer room." Upon decedent's death, the list was located along with a packet of documents reinforcing decedent's purported testamentary wishes inside the identified box.

Michael does not argue the list fails to accurately portray decedent's testamentary intentions, only that Courtnie failed to meet the required clear and convincing evidence standard. Michael refers to Michele's testimony stating decedent told her three weeks before his passing that he did not finish his will, and argues the "mere possibility [decedent] did not believe that he finished his will should have caused the [t]rial [c]ourt enough concern to justify a finding that [decedent] died intestate." Michael references Destiney's indication regarding the existence of a

possible signed will in decedent's locked gun closet, and testimony that it was unlike decedent to fail to sign his will, as support for this argument. Michael states because Courtnie is "one of the people who stood to inherit everything if [the list] was admitted, she unsurprisingly testified that [decedent] confirmed to her that he had a will and told her where the will was stored." Not only is this not relevant to our analysis on appeal, as we are deferential to the credibility findings of the trial court, but Michael fails to acknowledge a similar problem arises because Michael is the primary beneficiary if decedent is determined to have died intestate. *In re Erickson Estate*, 202 Mich App 329, 331; 508 NW2d 181 (1993) ("The reviewing court will defer to the probate court on matters of credibility, and will give broad deference to findings made by the probate court because of its unique vantage point regarding witnesses, their testimony, and other influencing factors not readily available to the reviewing court.").

The trial court found the testimony of decedent's friends and step-family to be credible and consistent with decedent's testamentary intentions in accordance with the packet of documents submitted. The trial court found decedent "told everybody what he wanted, he wrote down what he wanted. The lawyer put into writing what he wanted. It's all consistent." Although parts of the list could be construed as a "to-do list" or as edits to the estate planning documents, testimony consistently indicates decedent thought his affairs were in order. The trial court found the list was in decedent's handwriting and was "the document that [decedent] intended, as he told Courtnie, to control the disposition of his assets after his death." Considering all of the evidence, we hold that the trial court did not err in finding by clear and convincing evidence that decedent intended the list to constitute his will. Any conflicting evidence is not sufficiently strong to leave us with a definite and firm conviction that a mistake has been made. See also *In re Granville Estate*, 345 Mich 495, 499; 76 NW2d 827 (1956) ("The trial judge who heard the witnesses as trier of the facts is better able to judge of their credibility and the weight to be accorded their testimony, and we do not reverse unless the evidence clearly preponderates in the opposite direction.").

## III. CONCLUSION

The trial court did not clearly err by concluding Courtnie presented clear and convincing evidence decedent intended the list to constitute his will. Accordingly, the trial court did not err by admitting the list to probate as decedent's will.

Affirmed.

/s/ Adrienne N. Young
/s/ Kristina Robinson Garrett
/s/ Randy J. Wallace